Dear Representative Faucheux and Senator Schedler:
Gentlemen, you have requested, by way of correspondence dated October 2d 2002 and Exhibits A-F (inclusive), by correspondence dated November 8th, 2002 and Exhibits1-11 (inclusive) and by correspondence dated November 11th, 2002 an opinion of the Attorney General, in your capacities as State Representative and State Senator, relating to donations, transfers of real estate and other fiscal transactions between the University of New Orleans Foundation, Roger Huston Ogden, The Board of Supervisors of Louisiana State University, Mr. Patrick Taylor and Taylor Energy regarding the "Patrick F. Taylor Library", the "Roger Huston Ogden Museum of Southern Art", a building known as "Goldring Hall" and several other parcels of land at or near Lee Circle in New Orleans.
Your requests are identical and seek an opinion from our office regarding seven separate significant legal issues with regards to these parties and properties at or near Lee Circle in New Orleans, Louisiana.
First, you specifically ask for a review of the law, including ArticleVII, Section 14 of the Louisiana Constitution of 1974, to determine if legislative appropriation of $6.5 million to build Goldring Hall violates that provision of the constitution; and whether the cooperative endeavor agreement (or proposed cooperative endeavor agreement (EXHIBIT "F") among those parties also violates that provision.
Your third request is for an opinion as to whether the state may donate the use of Goldring Hall" to a private entity.
Your fourth request is for an opinion as to whether the state can operate a museum displaying a privately owned art collection.
Your fifth question is in three parts: (a) whether the State of Louisiana can pay the debt service of the UNO Foundation; and (b) whether the state can renovate the privately owned Patrick F. Taylor Library; and (c) whether the state can construct a privately owned parking garage.
Your sixth question is a request to determine if LSU/UNO's financing of the UNO Foundation's endeavors defeat the purpose of 17:3390.
Your seventh question is with regards to the naming of the "Roger Huston Ogden Museum of Southern Art" in honor of a living person and whether such a designation is a violation of R.S. 14:316.
 FACTUAL BACKGROUND
We have reviewed, for the purposes of discussion, the factual background provided by you in your letter and the documents attached. This opinion is based solely upon our review of those documents.
As we understand the history of this request, Mr. Patrick Taylor and his company, Taylor Energy, in 1987, began to acquire properties at or near Lee Circle in the City of New Orleans. One of those properties was an existing lot and building known then as the "Howard Library" located at 615 Andrew Higgins Drive. This property was renovated and restored and obtained national historic significance. It was renamed "The Patrick F. Taylor Library" at some time prior to the date of a sale to the UNO Foundation in 1994. In addition, a document named "Use Restrictions" executed by the UNO Foundation and Taylor Energy on October 21st, 1977 indicate an agreement between Mr. Taylor's company and the UNO Foundation (a private entity) to keep the name "Patrick F. Taylor Library" in perpetuity.
Mr. Taylor and his company also acquired two other buildings which became the corporate headquarters of Taylor Energy. These are described in your letter as the former American Bank Building located at 1018 St. Charles Avenue and One Lee Circle, which is located at 944 St. Charles Avenue.
He then acquired two other structures which are described as an abandoned YMCA building (described in your letter as "The Freeman Building", located at 936 St. Charles Avenue) and a deserted gas station.
Along with these buildings Mr. Taylor's company acquired vacant lots at municipal addresses of 1000 Camp Street, 1034 St. Charles Avenue, and 925 Camp Street.
Apparently Mr. Taylor sold to the University of New Orleans Foundation, seven of these eight properties on or about December 30, 1994. We have not been furnished with a copy of that document so we render no opinion as to its contents.
We have been furnished with two documents entitled "Property Restrictions by UNO Foundation in Favor of Taylor Energy Company" dated October 21st, 1997 and "Use Restrictions by UNO Foundation in Favor of Taylor Energy Company" of that same date. The restrictions imposed on the foundation as to the 615 Howard Avenue property are as follows:
 1. That the UNO Foundation was to retain title for at least fifty (50) years;
 2. That any deviation from that restriction was to be given in writing by Taylor Energy;
 3. That Taylor Energy retained the right of first refusal for a period of ten years;
 4. That no part of the document shall be "deemed to be a dedication of any portion of the Taylor Library Property to the General Public or for any public use or purpose"
The second document entitled "Use Restrictions" also applies to the 615 Howard Avenue Property and contains the requirement that the UNO Foundation name the building the "Patrick F. Taylor Library" for a period of 30 years. The 615 Howard Avenue property was and still is titled in the name of the UNO Foundation, a private organization.
There is also a lease back from Taylor Energy with regard to One Lee Circle (944 St. Charles), executed on December 30, 1994, which contains the following relevant provisions:
 1. That Taylor Energy's lease payments would be assigned to the payment of a mortgage note in favor of FNBC in the amount of $3,240,000.00 as base rental;
 2. In addition Taylor Energy agreed to pay additional rent equal to any and all costs of maintenance, taxes, charges and expenses whatsoever incurred with the use and occupancy of the premises, including, without limitation, all costs and expenses as defined in the lease;
 3. Additional amount of rents over and above the described amount was also assumed by Taylor with regards to a lease from the City of New Orleans as described therein;
 4. Further, the lessee, Taylor Energy, agreed as an additional obligation, to furnish and maintain insurance on the premises, including fire and extended coverage, sprinkler leakage coverage, flood hazard insurance, loss of rental income insurance, workman's compensation insurance and any other insurance as the lessor may require;
 5. Taylor also agreed to pay for any structural and extraordinary changes in the facility to make sure it was up to all governmental codes and standards;
 6. In addition, Taylor agreed to indemnify and hold harmless UNO Foundation from almost all forms of liability for claims for personal injury, damages, etc which might arise from the occupancy of the building by Taylor Energy;
This agreement further contains an option to purchase by Taylor Energy at the end of the lease term for a fair market value amount to be determined at that time.
Finally, that lease also included, as part of the lease, the right to use at least 50 parking spaces on the grounds of the property. The right to use these parking spaces is part of the lease agreement but the parking area is not to be construed as part of the option to purchase. The parking lot was and is located on one or several floors of "Goldring Hall". Thus the parking lot is public property.
In the Summer of 1996, during the regular session, the Louisiana Legislature appropriated the sum of $6,500,000.00, by Act No 45, Appropriations No: 1083, for, "Ogden Museum of Southern Art", Planning, Acquisition and Construction (Orleans) payable from the general obligations bonds of the state in the amounts of $500,000 from priority 2 and $6,000,000.00 from priority 5. In addition, the legislature again appropriated $8,750,000.00 in the 1997 Regular Session by Act 28 Sec 1, appropriation no R (1024). At that time $2,250,000 was paid from fees and self generated revenues, $1,500,000.00 was to be obtained by priority 1 general obligations bonds and $5,000,000.00 was to be appropriated from priority 5 obligations bonds.
In addition to the aforementioned documents, you have furnished us with a copy of a letter dated November 11th, 1996 from the Chancellor of UNO to Mr. Patrick Taylor, outlining a plan of action, apparently as a result of the 1996 appropriations limitations by the Louisiana Legislature. It was essentially a proposal from UNO on how to maintain UNO Foundation's permanent ownership of the Patrick E. Taylor Library and its grounds, to save the appropriation just given to them by the legislature and to keep the project going.
In that proposal, the following (among other things) was to take place:
 1. The UNO Foundation was to forever keep the Patrick E. Taylor Library and the land under it as foundation property.
 2. The foundation promised to never change the name of the library by restrictive covenant;
 3. The foundation agreed to release the vacant camp street lot and donate it free and clear to UNO for the construction of Goldring Hall, to be the modern gallery building of the Ogden Museum;
 4. That the $6.5 million appropriation would be applied only to construction of the hall and that it would be a university owned public building;
 5. That no public monies will go to the Patrick F. Taylor Library and that the completion and restoration of the library would be accomplished entirely with private funds;
 6. That UNO Foundation would grant a limited servitude for Taylor Energy Company's headquarters building located at 944 St. Charles.
On November 27, 1996, Mr. Roger Houston Ogden agreed to donate 600 works from his collection of southern art to the UNO Foundation as well. The Act of Acceptance was attached to your letter as Exhibit A. That donation was accepted on December 4th and 7th by the Chancellor of UNO and the UNO Foundation, thereby obligating both the University and the Foundation to its contents.
Those contents include the following initial conditions of the donation:
 a. That UNO Foundation and UNO obtain at least $11,000,000.00 from private donations, irrevocable pledges and public sources.
 b. That the interior space contained in the buildings be at least 60,000 square feet and shall be able to be expandable to 75,000 square feet.
 c. That the connection between buildings has to be approved by Mr. Ogden;
 d. That the renovation of the Taylor Library and the design and construction of Goldring Hall shall be satisfactory to Ogden;
 e. That Randolph Delehanty, PHD shall be retained to serve as first director of the Museum at the salary of not less than $60,000.00;
In addition, these initial conditions were to be satisfied or waived before January 1st, 1999 or the donation would be rescinded and the art collection returned to Mr. Ogden. It is not known if all of these conditions were met or if any waiver has been executed by Mr. Ogden, therefore no opinion is rendered as to the legal status of the donation with regard to these waivers.
Also, the document contains other "surviving conditions" including:
 a. that the name of the museum shall be "The Roger Houston Ogden Museum of Southern Art" and shall never be changed;
 b. that the museum buildings shall be used exclusively for the Museum; and
 c. that uses of any buildings and property in the Lee Circle Complex other than the Museum facilities shall be incompatible with the Museum;
 d. that the parking lot shall be at least large enough for 100 Cars and that access will be from Lee Circle;
 e. that if the UNO Foundation acquires the ownership or use of the Confederate Museum building, it too will become a part of the Ogden Museum;
 f. that if 944 St. Charles becomes available for use by the foundation, it also shall become part of the museum;
 g. that if 944 St. Charles is sold pursuant to some option in the Taylor lease, all proceeds shall be transferred to and become part of the Museum endowment.
It is specifically stated in the document that if any of these surviving conditions is not met or violated, Mr. Ogden may, after 90 days rescind the entire donation.
On June 8th, 1999, the University of New Orleans Foundation donated one of the properties acquired from Taylor and his company to the Board of Supervisors of Louisiana State University and Mechanical College. That transfer describes the property donated but does not refer to municipal numbers. Also, the survey of the property was attached as Exhibit "A" to that document, but was not provided to our office. Therefore we are unable to determine whether the exact properties sold to UNO Foundation were also donated then to LSU. However, for the purposes of discussion herein we have assumed that it is the property upon which Goldring Hall was built located at 925 Camp Street.
Additional facts regarding these issues are contained in two undated executive summaries and proposed resolutions of the LSU Board of Supervisors. The first Executive Summary (Exhibit D) states as follows:
"The University, though an annual state appropriation of $200,000.00 currently pays the salaries of the Museum Director and the associate director, as well as certain operating expenses. The projected annual utilities cost of Goldring Hall, the University owned building, is approximately $226,000.00. The anticipated UNO share of the operating expenses of the Museum is the current $200,000.00 expenditures and the Goldring Hall utilities, a total of $426,000.00 to be paid to the Foundation via a cooperative endeavor agreement.
In return for the annual payment of $426,000.00 UNO will receive a variety of services from the foundation and Ogden. The Foundation will continue to provide administrative services for the museum, Ogden will assume the responsibility for operating the museum, and both will provide support of the Arts Administration Program to be available to students in the Colleges of Liberal Arts, Business Administration and Education. In addition, the Foundation will finance the remaining $6,2 million needed to construct and furnish the complex and to support the initial operating costs of the museum."
The second undated Executive Summary (Exhibit E) states:
"The 67,000 square foot museum complex is scheduled to open in the winter of 2002 and will be housed in two buildings on Lee Circle in New Orleans, one owned by UNO and one owned by the Foundation
The Foundation, The Ogden Museum of Southern Art, Inc.(Museum Foundation) and the University wish to enter into a cooperative endeavor agreement for the operation of the museum. The Foundation will finance the remaining $6.2 Million needed to construct and furnish the complex and make the collection and privately-financed library building and other facilities available. The University will make Goldring Hall available to the Museum, contribute a portion of the expenses of the Museum in the form of $425,000.00 for capital support of Goldring Hall and the Museum, including construction, renovation, expansion, debt service or other appropriate expenses of the museum and $425,000.00 for annual operating support to the Museum in the form of salaries, benefits, utilities, security, maintenance and other appropriate expenditures."
The final document reviewed by this office is an undated and unsigned Cooperative Endeavor agreement between the Board of Supervisors of Louisiana State University, the University of New Orleans Foundation, and the Ogden Museum of Southern Art, Inc. We have not been provided with any corporate documents from the museum nor any of the appropriate resolutions adopted by the boards of those parties.
That proposed cooperative endeavor agreement does contain the following recitations which are relevant to your query:
 That the University owns property located at 925 Camp Street (Goldring Hall);
 That the Foundation owns property at 615 Andrew Higgins Drive (the library);
The agreement states the purpose of the endeavor as "operating, managing, maintaining, occupying and otherwise using the Museum to accomplish both educational and economic development goals as set forth herein."
In the agreement, the University is to contribute the following:
 "-University shall provide Goldring Hall for the placement of Art and for the use of the Museum and for the purposes set forth herein.
 -University shall provide $425,000 annually to the Foundation to be utilized for capital support of the Museum, including construction, renovation, expansion, debt services or other appropriate expenses of the museum.
 -University shall provide annual operating support to the museum in the form of salaries, benefits, utilities, security, maintenance or other appropriate expenditures in the amount not less than $425,000.00 per year.
The UNO Foundation's contribution is to place or cause to be placed the Art in the museum and to provide for the Library for the placement of the Art. The Roger Houston Ogden Museum Foundation, Inc. makes no contribution in the document but apparently is the provider of the artwork to be displayed.
In order to maintain consistency, we will attempt to address your multiple layered questions in the order that you have posed them. However, a general discussion of the general legal principals involved is necessary.
 DISCUSSION OF GENERAL LEGAL PRINCIPALS
As is well known, the University of New Orleans is an integral part of the LSU system. See: R.S. 17:1551. The system is run by the Board of Supervisors under R.S. 17:3215. Their general powers include:
 (1) actively seeking and accepting donations, requests or other forms of financial assistance (Sec 2);
(2) to purchase lands and construct buildings (Sec 7);
 (3) to purchase equipment and properly maintain and make improvements to its properties.
The Board of Supervisors may contract with any agency or enter into any contracts or agreements for the joint financing, supervision or conduct of cooperative enterprises under the authority of R.S. 17:3353. These contracts shall be made on terms most favorable to the college and must comply with the public bid laws. See: R.S. 17:3355(a). However, they do have the authority to lease their facilities within those restrictions under R.S. 17:3361.
In addition, they have the authority to "assist any university sponsored organization to make loans, etc. See: R.S. 17:3366. There is no question that the UNO Foundation is such an organization with private status under R.S. 17:3390, even if they receive public funds. See: 17:3990(c).
The constitutional and legal duty of LSU and the LSU system, of which UNO is a part, is to promote and facilitate the public education of its students through all appropriate means. Guste vs. Nicholls CollegeFoundation, 564 So.2d 682 at 688.
The public purpose obliged by this duty is best stated by the preamble to the education article of Louisiana Constitution, Article VIII of 1974, which provides as follows:
 "The goal of the public educational system is to provide learning environments and experiences, at all stages of human development, that are humane, just and designed to promote excellence in order that every individual may be afforded an equal opportunity to develop his full potential".
As to the naming of public buildings after living human beings, R.S.14:316 is the statute which applies. It prohibits the naming of buildings after living persons. This is a criminal statute and therefore must be read strictly and not by analogy. Our office has previously opined that this prohibition applies only when entire buildings are to be named in such a fashion. Attorney General Opinions No: 00-66, 86-814.
With regards to cooperative endeavors and the issue of public funds being expended, the constitutional prohibition under Article VII, Section14 of the Louisiana Constitution of 1974 forbids the gratuitous loan, pledge, or donation of the "funds, credit, property or things of value of the state or any political subdivision". This identical language and prohibition were present in Article IV, Section 12 of the Louisiana of 1921; Article 58 of the Constitution of 1913; and Article 58 of the Constitution of 1898. The substance and language of Article VII, Section 14 originated in Article 56 of the Constitution of 1879. Thus the legal rule replicated in that article is one of the most enduring and formally consistent constitutional principles in Louisiana law. This is of some import for interpretation in that there is over one hundred years of jurisprudence interpreting different constitutions but the identical provision in each.
The Louisiana Supreme Court reviewed this long time provision in Cityof Port Allen vs. La. Risk Management et al, 439 So.2d 339 (La 1983) where it ruled that "this section is violated whenever the state or political subdivision seeks to give up something of value when it is under no legal obligation to do so". Even if political subdivisions cooperate for a public purpose, they still may not give away their assets merely for that `public purpose' id at 401-402.
The office of the Attorney General, in several opinions stemming as far back as 1978 (see AG Op 78-1258), has consistently opined that this section is violated any time that the public funds expended is not commensurate with the service rendered by the private entity.
To further qualify an expenditure of public funds as non-gratuitous, the Attorney General has applied the "legal obligation or duty" standard as only a threshold requirement. The expenditure must also be dedicated to a public purpose and create a public benefit proportionate to the cost. A public purpose and benefit is presumed only where the legal obligation or legal duty to expend the funds is derived from the authorization of the constitution, of a validly enacted statute, or home rule charter. See Opinions of the Attorney General No: 90-519, 90-392, 90-161 and 90-160.
When no presumption obtains, such as when the legal obligation for the expenditure is created by a contract authorized by constitution, statute or charter, the existence of the public purpose and proportionality of the public benefit must be shown. Attorney General Opinion 90-651.
In order to lawfully spend public funds, all political subdivisions and agencies must conform to this fundamental standard for state wide fiscal policy, rather than formulate myriad, fragmented and distinct fiscal policies for each different jurisdiction of each governing authority. The "legal obligation or duty" standard safeguards the integrity of the legislative constitutional power. See Attorney General Opinion 90-516.
Public entities must have a direct constitutional authority or obligation to make the specific expenditure, or they must have such a duty or obligation specifically delegated by their statutory authority, and such duty or obligation must subsume and logically justify the nature and purpose of the transaction in which public funds or property are transferred or alienated. Therefore, the public entity must have a statutory duty or obligation to spend the funds, or transfer the public things of value, for a statutorily prescribed purpose that is constitutionally authorized, and by a means that is also authorized by law, even if discretionary. See Attorney General Opinion 90-651.
It is also important to note that the language of Section 14(C) regarding cooperative endeavors has been interpreted by our office to not be an exception to the prohibition in Section 14(A). See Attorney General Opinion 92-402 and that only those exemptions allowed under Section 14(B) are permissible.
Further, although there are admirable goals which are sought to be achieved, the worthiness of the contemplated use of public funds is immaterial to the constitutionality of a transfer of public funds. Jamesvs. Rapides Parish Police Jury, 113 So.2d 88 (La.App. 2nd Cir 1959). That decision states:
 "These specific prohibitions have been wisely implanted in our fundamental law, for it is conceivable that without such prohibitions the state, or a political subdivision thereof, might so deplete the public fisc by contributions to almost innumerable worthy private and semi-public enterprises as to seriously impair the necessary expense of conducting more prosaic but more important government functions".
Therefore, as to any cooperative endeavor agreement confected under Article 14(C) to be constitutionally sanctioned it must meet a three part test:
 a. The public agency must have a legal obligation to expend public funds;
b. The expenditure must be for a public purpose;
 c. The expenditure must create a public benefit proportionate to its cost. See Attorney General Opinions No: 92-722, 90-651 and 90-392.
In addition, our office has previously opined that any exemption from the express provisions of Article VII, Section 14(A) can only be recognized if there is "specific" constitutional authorization for the grant or loan of public funds or things or value. See Attorney General Opinion 92-402.
Our office has also opined that any indirect method of providing these funds when the agency would be directly prohibited would also be a violation. It is axiomatic that such indirect loans or donations are prohibited if direct loans or donations are prohibited. See Attorney General Opinion 90-271.
Therefore we now turn to the balance of the questions you presented in your first request:
1) Question:
 Did the State's appropriation of $6.5 million to build Goldring Hall violate Article VII, Section 14 of the Louisiana Constitution?
Answer: NO
The donation of real estate by the UNO Foundation to the LSU Board of Supervisors in 1999 included the lot upon which Goldring Hall has been constructed, therefore it is a state building owned by LSU and constructed pursuant to the Capital Outlay Act with a combination of state and private money. It is a state owned building and therefore any expenditures for construction, maintenance and ongoing operations consistent with its public purpose is legal under R.S. 17:3215.
Therefore, the appropriation of state money by the legislature for the construction of a building to be owned by LSU is not only legal but entirely appropriate. The fact that a private entity may develop and profit from the project does not negate its public nature. See: Town ofVidalia vs. Unopened Succession of Ruffin, 663 So.2d 315, (La.App. 3rd Cir. 1995)
Therefore it is our opinion that the funds dedicated to the construction of Goldring Hall by the Louisiana Legislature are not a violation of La. Const. Art. VII, § 14.
2) Question:
 Will the Cooperative Endeavor Agreement among UNO Foundation, LSU/UNO, and the Ogden Museum of Southern Art, Inc. violate Article VII, Section 14
of the Louisiana Constitution?
 Answer: YES-THERE ARE TERMS AND CONDITIONS WITH REGARDS TO THE AGREEMENT WHICH MAY VIOLATE THE CONSTITUTION
In responding to this inquiry we have been provided with a draft of a cooperative agreement in the documents indicated in the factual discussion above as well as the donation and acceptance by the Chancellor of UNO to certain conditions of the donation by Roger Huston Ogden of his Southern Art Collection. We base our opinion on the terms and conditions of the proposed cooperative endeavor agreement, the executive summaries provided therewith and the terms and conditions of the donation and acceptance which are incorporated into that document by reference.
As indicated in the general discussion above, our office has issued a significant number of opinions with regards to cooperative endeavor agreements and there is at least one Supreme Court opinion (See Guste v.Nicholls College Foundation, 564 So.2d 682 (La. 1990)) addressing the method by which cooperative endeavors can involve the use of state monies and property to support cooperative projects with a private entity.
In order to meet the requirements of La. Const. Art. VII, § 14, (1) the support must be "sanctioned" or "authorized by law" or given in furtherance of the University's constitutional or legal duties, (2) the support must be directed to a public purpose, and (3) it must create or enhance a public benefit or a value proportionate to the cost of creating it. (See Guste; see also Attorney General Opinion Nos. 90-651, 92-204, 93-787, 95-209, 95-221, 96-248, 96-891, 99-70.)
LSU has been granted broad constitutional and statutory authority to supervise and manage the institutions and programs administered through the LSUS System. (See La. Const. Art. VIII, § 7 and La.R.S. 17:3351.) In fulfilling its teaching, research, and public service missions, the University acts pursuant to its legal obligations and duties to supervise and manage its institutions and to "provide learning environments and experience, at all stages of human development, that are humane, just and designed to promote excellence in order that every individual my be afforded an equal opportunity to develop to his full potential." See La. Const. Art. VIII, PREAMBLE.
The LSU Board's decision to participate in a museum of art operated in conjunction with the University of New Orleans, one of the campuses in the LSU System, would address the teaching, research, and public service missions of the University and would be sanctioned or authorized by the constitutional and statutory authorities above cited.
However, the terms and conditions imposed by the proposed cooperative endeavor agreement presented to our office obligates LSU to
----furnish Goldring Hall for the museum for no rent.
 ----"provide capital support including construction, renovation, expansion, debt services or other appropriate expenses" of $425,000.00 annually.
 ----"provide annual operating support, salaries, benefits, utilities, security, maintenance for an additional $425,000.00.
UNO provides the artwork and the Patrick Taylor Library for the placement of the art. The "Ogden Museum of Southern Art Inc." makes no obligation or contribution to the agreement and retains, by way of the original donation, the right to rescind the donation of the artwork owned individually by Roger Houston Ogden if any of the conditions cited above are not complied with. We are therefore compelled to examine what the expenditures contemplated by LSU and the public fisc may be used for.
First, any expenditures of funds for the purpose of salaries to the private corporation known as Ogden Museum of Southern Art, Inc. or the UNO Foundation is prohibited. See Attorney General Opinion 93-164. It is the opinion of our office that public funds can only be used for ordinary operating expenses of maintaining the public building, not the salaries, benefits or other emoluments to employees of the non-profit corporation. The "Museum" is not a political subdivision of either the state or a part of LSU. It has no special authorization by statute to operate and is not a creature of local governmental authority. Therefore, any expenditures of public funds towards the salaries, benefits or other compensation of private employees are prohibited under Article VII, Section 14.
In addition, the facts are clear that Roger Huston Ogden has donated his vast collection of artwork in return for some significant promises and obligations, by UNO and therefore the State of Louisiana, to hire persons of his choice, at salaries where he dictates the minimum compensation. In addition he is given authority to direct and control all construction, plans and property development of public property as well as the private foundation property in the complex. These terms are not "terms most favorable to the college" as required under R.S. 17:3353
therefore any agreement containing them would not be valid.
As discussed above, it is also our opinion that what is prohibited directly cannot be accomplished indirectly. Therefore, any public funds which may be distributed to the UNO Foundation for the purpose of paying these kinds of obligations would also be prohibited.
It is the opinion of this office that any cooperative endeavor which may be confected in this matter must meet the three part test indicated in the discussion above. And, as worthy as the cause may be, there can be no public expenditures for any purpose not specifically authorized under Article VII Section 14(B).
With regards to the second factor, i.e. that the support must be directed to a public purpose, the LSU Board's support of the museum would be directed to the specified public purpose of providing and making available to the citizens of New Orleans and the State the aesthetics of an art museum whose major emphasis is southern art. This purpose, in our opinion, is lawful and laudable. However, the authority which allows LSU to enter into cooperative endeavor agreements under 17:3353, specifically requires that any such agreement be on terms most favorable to the college and comply with the public bid laws.
The terms and conditions of the Donation of Art by Roger Huston Ogden, individually and accepted and signed by the Chancellor of UNO oblige the LSU system to allow Roger Houston Ogden to dictate the minimum limits of funding ($11,000,000), the minimum space allocation for the museum (60,000 to 75,000 sq feet), architectural approval of design and construction of the building, final approval of any renovations, the specific appointment of the museum director (Randolph Delehanty) and his salary, the specific naming of the facility as the ROGER HOUSTON ODGEN MUSEUM OF SOUTHERN ART, and finally mandating the exclusive use of the facility for the museum's purposes.
If any of these items is incorporated into a cooperative endeavor agreement or if any funds are spent or transferred according to these conditions, it is the opinion of this office that they are not favorable conditions under 17:3353 and funds expended for these purposes would be violative of Article VII Section 14. It is the opinion of this office that any contractual requirement of LSU, UNO or the public fisc to expend funds for these purposes would be violative of the constitution.
Assuming arguendo that none of the offending terms and conditions are incorporated into any agreement to fund the Museum, the third inquiry must none the less be satisfied. IE, is the public benefit derived from the donation of these private works equal to or greater than the public funds or property to be utilized. Our office has previously opined that such an inquiry is fact sensitive.
The facts presented from the documents provided indicate that the University will provide a building constructed for $11,000,000.00 for free and exclusive use, in perpetuity and approximately $850,000.00 per year for operating expenses. The Foundation will provide the artwork and the Patrick Taylor Library for purposes of additional display areas. The Roger Houston Ogden Museum of Southern Art, Inc. does not, by way of any agreement, provide any contractually obligated specific services under this agreement. Our greatest concern under the facts known is that the donation of artwork can be rescinded at any time unless all of the conditions discussed herein are met. It is our opinion that the value of such a tenuous donation should be determined in advance of the confection of any cooperative agreement to determine the proportionate value.
We do note, however, that the public benefit to UNO, the City of New Orleans and the State of Louisiana is significant and that the value of Goldring Hall and its free and exclusive use and occupancy is also significant. We also acknowledge that previous opinions of this office have indicated that the aesthetic value may also be included in making the determination.
Because this is ultimately a fact-sensitive inquiry, we make no formal opinion as to the proportionate value of what the state is providing as opposed to the contributions of UNO Foundation and the Roger Houston Ogden Museum of Southern Art Inc. to the proposed cooperative endeavor agreement.
3) Question:
Can the State donate the use of Goldring Hall to a private entity?
Answer: NO
As discussed above, the donation of this building to a private entity is specifically prohibited under VII Section 14. However, LSU does have the authority to "assist any university sponsored organization to make loans, etc. under R.S. 17:3366. In addition they have the authority to lease their facilities within the restrictions of R.S. 17:3361.
There is no question that the UNO Foundation is such an organization with private status under R.S. 17:3390. However, the Roger Houston Ogden Museum of Southern Art Inc. does not qualify as one of those organizations to which this would be allowed. However, if all the requirements of R.S. 17:3353 and the three part test of VII, Section 14 are met, a cooperative endeavor agreement may be entered into in this regard.
4) Question:
 Can the State pay to operate a private museum displaying a privately-owned art collection?
 Answer: YES-but only with those expenses which may be allowed under VII Section 14
As the transaction is presently structured, the State is agreeing to provide "capital support, including construction, renovation, expansion, debt services or other appropriate expenses of $425,000.00 annually. It is certainly reasonable, logical and proper for the state to pay for any expenses towards the construction, maintenance and expansion of its own building, which we have discussed above, known as Goldring Hall.
However, the University also "shall provide annual operating support to the museum in the form of salaries, benefits, utilities, security, maintenance or other appropriate expenditures in the amount not less than $425,000.00 annually." It is the opinion of this office, pursuant to the discussions above, that any funds attributable to the salaries and benefits of the private employees of the museum are prohibited. However, as to utilities, security and maintenance, it is the opinion of this office that those expenditures are directly related to the preservation and protection of public property and as such are allowed.
5) Question:
 Can the State pay UNO Foundation's debt service and/or to renovate the privately owned Patrick F. Taylor Library and to construct a privately-owned parking garage?
Answer: NO
Under the proposed cooperative endeavor agreement the State is agreeing to pay any "debt services". As such it is not allowed as an exception under Article VII, Section 14(B) and therefore is not permissible. Although it may be contemplated that the Foundation take that money and pay debt service, thereby making such debt service payment not paid by the University, it is our opinion that such is still prohibited. As indicated in our previous opinion, it is axiomatic that such indirect loans or donations are prohibited if direct loans or donations are prohibited. See Attorney General Opinion 90-271.
The same is true with respect to the renovation of the Patrick F. Taylor Library and the construction of the privately-owned parking garage. However, we note that in each agreement between Patrick F. Taylor and the UNO Foundation, no public funds are contemplated to be spent in such a fashion and that Taylor Energy is obligated to be financially responsible for bringing any part of the property donated by Mr. Taylor to code. No documents presented to us indicate that any public funds were allocated or spent for either of these projects or properties.
6) Question:
 Does LSU/UNO's financing of UNO Foundation's endeavors defeat the purpose of Louisiana Revised Statutes § 17:3390?
Answer: NO
The provisions of La.R.S. 173390 address the status of a private nonprofit corporation created to support a university that meets the safe harbors set forth in that provision. One of those safe harbors is set forth in La.R.S. 17:3390B(3), which dictates that the private corporation reimburse, either directly or by in-kind services, the cost of housing, personal, and other support furnished to the corporation by an institution of higher education. The draft Cooperative Endeavor Agreement makes clear that the University is being repaid through the in-kind services of the foundation to provide and operate a museum to benefit the University.
According to the documents provided, the UNO Foundation is providing the Patrick Taylor Library, all teaching and other educational services and equipment, a portion of the construction cost of building Goldring Hall, and the artwork previously donated to the Foundation by Roger Houston Ogden.
Therefore, again, if the proportionate value of the services and the artwork can be determined to be equal to LSU's financial contribution it would be proper.
7) Question:
 Did the naming of the Ogden Museum of Southern Art in honor of a living person violate Louisiana Revised Statutes § 14:316?
Answer: YES
Louisiana Revised Statutes 14:316 reads as follows:
 "No public building, public bridge, public park, public fish or game preserve, or public wildlife refuge built, constructed, and maintained in whole or in part with public funds and title to which stands in the name of the state or any of its subdivisions or in the name of any institution receiving its support in whole or in part from the state shall be named in honor of any living person."
As to the buildings listed herein it is the opinion of this office that 615 Andrew Higgins Drive (the Patrick F. Taylor Memorial Library), is a private building, being donated to the UNO Foundation, a private entity, therefore it can be named as proposed without any violation of the law.
However, the property located at 925 Camp Street (Goldring Hall) cannot be named after any living human being as it would violate the provisions of R.S. 14:316. Such would also be the case if the combination of several buildings or a combination of a complete building and portions of another building were named after a living individual. Under the plans and factual scenario described above, naming the complex or any complete building as the "Roger Houston Ogden Museum of Southern Art" would be a violation of the spirit, if not the letter of R.S. 14:316. We base this opinion on the following facts.
First, we have been furnished with a drawing by Escew and Filson, which is attached to the Act of Acceptance described above. According to that drawing, the "Museum" is to occupy a "new" building (Goldring Hall) of approximately 44,000 square feet connected to an existing building (The Patrick Taylor Memorial Library) by a linked corridor with the Louisiana Confederate Museum separating the two. According to that drawing, the museum occupies Goldring Hall in it's entirety as well as a publicly constructed corridor and the privately owned Patrick Taylor Memorial Library.
Second, we note that under the terms and conditions of the donation by Roger Houston Ogden to the UNO Foundation and accepted by UNO, that there is a mandate that the "Buildings shall be used exclusively for the museum". It is our opinion that this exclusivity violates the spirit, if not the letter of R.S. 14:316. Also, see Attorney General Opinion 97-206, which is consistent in this regard.
Further, the fact that the building is designated as "Goldring Hall" in parts of these documents is a distinction without a difference. There is no question but that Goldring Hall is, along with the publicly constructed connecting corridor and the entirety of an additional building to be named as the "Roger Houston Ogden Museum of Southern Art".
It is not persuasive that the name of the museum is a "designation of an enterprise, function or program" within the public building. The construction and contemplated use of this building as the museum is the reason d'etre for the entire series of transactions creating, restoring and transferring 925 Camp Street to LSU. Such a thinly veiled distinction is not sufficient to survive the language of R.S. 14:316 as outlined above.
However, our office has opined that a wing or other portion of a public building can be named in honor of a living person without violating the above referenced statute. See Attorney General Opinion 00-66. Therefore, if the museum occupies only a wing or other portion of the building, it would not be prohibited. In addition, if any of the privately owed Foundation buildings were to be named such, it would not be prohibited under this statute.
We hope this has satisfied your inquiry.
Yours truly,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 BY: ___________________________ BURTON P. GUIDRY Assistant Attorney General
BPG/hs
DATE RELEASED: March 17, 2003